## SEVEY'S CASE.

*In the absence of better proof, evidence of long and uninterrupted usage, reputation, the declarations and conduct of the owners of the adjoining land, and the public acts of the town, was properly admitted to prove that an ancient corporation of proprietors, now extinct, had dedicated a certain lot to the public use as a landing place.*

THIS was an indictment against *John Sevey & al.* charging them, in the first count, with having erected a nuisance on a public highway in *Wiscasset*; and in the second, with the same nuisance, as erected on a public landing-place. It was tried before *Weston J.* upon the general issue.

The erection of a building and an abutment, since the year 1812, which constituted the alleged nuisance, was not denied.

On the part of the government it was proved that the land was claimed as a landing-place, laid out by the proprietors of the *Wiscasset* company, and known as such more than sixty years ago; and that it had ever since been designated and known as a "town landing." The proprietors of the *Wiscasset* company, it appeared, were formerly owners of a large tract of land including *Wiscasset* point, on which the landing was situated, as appeared by a deed dated Sept. 19, 1733. They purchased this tract of one *George Davy*, who bought it of three of the *Sheepscut* sagamores, by deed dated in 1663. The proprietors, on the 30th day of *June* 1762, conveyed the tract to the proprietors of the *Kennebec* purchase, excepting twelve quarter-acre-lots, which included the premises. On the 29th day of *October* 1785, they conveyed to one *Timothy Parsons* a tract of land on the south side of the premises, bounding it "northerly on the town landing."

The proprietors of *Wiscasset* long since ceased to exist as a corporation; nor could any of them, nor their representatives, nor their records be found, after diligent inquiry. It was proved, however, by *Seth Tinkham*, Esq. that in 1789, when he was town clerk of *Wiscasset*, an ancient plan was in his possession, purporting to

have been taken by order of the proprietors, on which were delineated the several lots, streets and landings in the town, the premises being designated thereon as the "town landing;" but this plan also was now lost.

The selectmen of *Wiscasset*, *May* 10, 1771, laid out the premises as a road, which, after due notice, was in the following year regularly accepted by the town, and recorded. In 1794, it being represented " that the former laying out of several of the streets and landings in *Wiscasset*, was obscure and uncertain, and the bounds of said streets, &c. not certainly to be found;" the selectmen, at the desire of the inhabitants, ascertained by actual survey, the courses and widths of the streets; and in their return thus described the premises;—" also the landing or street between the southern side of Mr. *John Sevey's* wharf, and the northern side of Mr. *Timothy Parsons's* store and wharf, we lay out the whole width between said wharves, and the courses said wharves run to low water mark";— which return, agreeably to due notice to the inhabitants, was regularly accepted by the town, and recorded. And in 1798, 1801 and 1804, articles were inserted in the warrants for town meetings, at the request of *Timothy Parsons*, to see if the town would discontinue the town landing; which articles were uniformly dismissed by the town. One of these warrants was served by *Wyman B. Sevey*, father of one of the defendants.

It further appeared that *John Sevey*, father of said *Wyman*, made his will, which was proved *Feb.* 29, 1796; appointing said *Wyman* his executor; who in that capacity returned an inventory of the estate of his testator, describing part of his real estate as " the land and flats below Water street, from the town landing, by said *Parsons's* wharf," &c. And by a mutual deed of division of their father's estate between said *Wyman* and *Samuel Sevey*, dated *May* 17, 1798, the latter released to the former the lot adjacent to the premises, referring to the town landing as one of the bounds. It also appeared that the defendant *John Sevey*, in a deed of mortgage of *January* 27, 1824, described the estate mortgaged as " bounded southeasterly on the town landing." And it was proved that the place had been constantly used for a common landing for stones,

lumber of all kinds, fish, and produce, ever since the memory of the oldest inhabitants. It had never been repaired or made conveniently passable as a street; the bank being originally very steep, and made more so by the elevation of the street running along the shore; but there were paths leading from the water, by which lumber was drawn up in carts.

On the part of the defendants it was proved that the part of the premises on which the alleged nuisance was erected, was conveyed in 1792, by one *Samuel Barstow* to *John Sevey*, grandfather of one of the defendants, who claimed the same from him by descent. And some witnesses testified that the only passage way for teams from the ancient wharf to the street, was across that part of the premises now covered by the erection complained of; that the testator always used this part of the premises as his own property, and built an abutment across a corner of it for his own convenience, which was under the present abutment, but did not extend out so far; that but little use had ever been made of the landing-place; and any approach to it from the street, except for foot-passengers, was obstructed in 1808, by an embankment erected by the surveyor of highways, to preserve the street from being washed away by the tide.

But to the manner in which the landing had been used, and the extent of the old abutment, there was opposing testimony offered by the government. And it was proved that *John Sevey*, the ancestor, had often declared, after the year 1792, that his land was bounded southerly by the town landing, and extended no farther south than the capsill of his wharf; that when he had taken pay for vessels fastened to his wharf on that side, he had declined to receive dockage, saying that the landing belonged to the town; and that the town, about twenty-seven years since, had passed regulations respecting the use of the lower part of the premises.

Upon this evidence the Judge directed the jury to return a verdict against the defendants; which was taken subject to the opinion of the court upon the facts reported as above.

The case was briefly spoken to by the *Attorney General* for the State, who referred to *Commonwealth v. Newbury*, 2 *Pick.* 51, and

1 *Pick.* 180 ; and by *Sevey* for the defendants. The opinion of the Court was read at the following *September* term, as drawn up by

WESTON J. It is well known that there exist, and have existed for many years, in this State and in Massachusetts, certain grounds designated as public landing places. Many of them it may be presumed have been used as such, at and from an early period in the settlement of our country. There does not appear to have been provided by law any mode of laying out and setting apart lands for this purpose. Nor has any such authority been exercised for many years, if it ever was, by any court, town or other corporation, over the lands of others. If landing places have been established at any recent period, it must have been by a dedication of them to public use by proprietors or individuals, who were owners of the land. The landing places now in existence had their origin, probably, from the vote and appointment of proprietors of townships or considerable tracts of land, who found it for their interest to establish privileges of this kind for the common benefit. If towns have ever done this in their municipal capacity, it must have been with the assent or acquiescence of the owner of the soil. But whatever may have been their origin, which it might now be difficult in many instances, from the loss or destruction of records or other documents, to ascertain, they have been recognized and protected by law. By the statute of 1785, *ch.* 1, *sec.* 4, it was provided, that all fences or buildings set up and erected on lands then used and improved as public landing places, or such as might thereafter be laid out and appropriated to that use, without lawful permission therefor, should be esteemed nuisances, and be abated as such. The same provision was re-enacted in this State, by *Stat.* 1821, *ch.* 24, *sec.* 5.

From the facts reported, it is very clear that the space between the wharf formerly owned by *John Sevey* and that of *Timothy Parsons,* has been known by the name of the town landing for more than sixty years ; and as such has been recognized by the declarations and acts of those, under whom one of the respondents claims, and by himself in his mortgage deed of *January,* 1824. The ancient extent and continued use of the landing place, was proved also by

16

several witnesses. There is reason to believe that this landing place, which has not been claimed until very recently as private property, was designated as such by the proprietors of the *Wiscasset* company. As these proprietors have long since ceased to exist as a company, and as their records, after diligent search, cannot be found, the regular evidence of this dedication cannot be adduced. But it appears that a plan existed forty years ago, taken by order of the proprietors, in which the premises were delineated and described as a town landing. This evidence, together with the fact that it was before and since known and used as such, may well bring it within the protection of the *Massachusetts* statute of 1785, and of our own of 1821, unless the respondents have made out a title to the premises, or other justification. They rely upon a deed of release from one *Samuel Barstow*, dated *October* 18, 1792 to *John Sevey*, grandfather of one of the respondents ; and a claim and possession of the land under it. It does not appear that *Barstow* ever had possession of the land. One witness testified that *John Sevey*, the grandfather, extended an angle of his wharf across the premises, using and claiming them as his property. Other witnesses testified that the angle of the wharf did not extend so far ; and that there was a path or passage way to and from the street across the premises to the wharf, which was used by the public. If, however, *Sevey*, the grandfather did extend an angle from his wharf to facilitate access thereto, which, if erected, appears to have been used by the public, it would not be such an exclusive appropriation, as would give him the seisin and property against the public right. He was entitled to use it in common with others, and what was done by him might be for the benefit, rather than the annoyance of the public. But it is in proof from the testimony of a witness, who occupied for several years after 1792 a part of a store on the wharf, that *Sevey*, the grandfather, repeatedly pointed out to him the bounds of his land ; admitting that it was bounded southerly by the town landing, and that it extended no farther south than the capsill of his wharf. And in conformity with this claim the estate was inventoried, and conveyances made by those who derived title from the grandfather, bounding this part of his estate southerly on the town landing. The release of *Barstow* therefore, was a mere

nullity; neither party being in possession, and the grantee disclaiming any right or interest under it. The existence of the public landing having been made out, by the best evidence the nature of the case admits; and the respondents failing to make out any title, or to establish any justification, for the erection complained of, the case is brought within the statute of Maine before cited, which declares such erection a nuisance, for which the party erecting or continuing it may be indicted. An indictment for erecting a fence upon a public landing place was sustained in *Massachusetts*, under a statute of the Commonwealth, of which ours is an exact transcript. *Commonwealth v. Tucker*, 2 *Pick*. 44.

If the premises had not been shown to be a public landing, there is in the case, evidence that a town way was duly laid out over them. And any building, erected or continued on any town or private way, is a nuisance. *Stat*. 1821, *ch*. 118, *sec*. 25 and 26. By the thirteenth section of the same statute, it is made the duty of towns to keep in repair town ways, as well as highways, properly so called, and for any failure in this duty, they are liable to an information in behalf of the State. 2 *Pick*. 51. However, as the respondents are clearly liable under the second count; and both counts being for the same offence in different forms; it becomes unnecessary to determine their liability, regarding the premises as a town way.